# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>v.<br><br>ERNEST CLARK,<br><br>          Defendant. | Case No. 11-CR-30-JPG<br><br><br>**ORDER** |

  On February 24, 2012, a jury convicted defendant Ernest Clark ("Clark") of six counts of armed bank robbery and six related counts of using a firearm in furtherance of a crime of violence. On April 23, 2012, Clark filed a motion for a new trial based on newly discovered evidence – an FBI 302 report of a second interview with Jeffrey Moore ("Moore"), one of the cooperating witnesses who testified against Clark at trial. (Docket #180). In this motion, Clark argues that the newly discovered evidence reveals a government violation of *Brady v. Maryland*, 373 U.S. 83 (1963), thus entitling him to a new trial.

  To receive a new trial based on a *Brady* violation, a defendant must show (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant; and (3) that it is material to an issue at trial. *See United States v. Daniel*, 576 F.3d 772, 774 (7th Cir. 2009). "Favorable" evidence includes exculpatory substantive evidence, as well as evidence with impeachment value. *United States v. Bagley*, 473 U.S. 667, 682 (1985). Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different." *Id.* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitely*, 514 U.S. 419, 434 (1995).

Ordinarily, newly-discovered impeachment evidence does not warrant a new trial under *Brady* because it is often "cumulative of other evidence presented at trial." *See United States v. Salem*, 578 F.3d 682, 688 (2009). The Supreme Court has noted that evidence impeaching an eyewitness may not be material if the government's other evidence is strong enough to sustain confidence in the verdict. *See Smith v. Cain*, 132 S.Ct. 627, 630 (2012) (citing *United States v. Agurs,* 427 U.S. 97, 112–113 (1976)). However, in some cases, where the government's case rests entirely on the uncorroborated testimony of a single witness, new impeachment evidence is material. *Id*.

Here, according to the government, the prosecution did not learn of the 302 report until after trial. Thus, the report was never disclosed to Clark. Accordingly, the only question for the court is whether the 302 report was favorable and material to the determination of Clark's guilt. In support of his motion, Clark asserts that the information in the withheld 302 report could have been used to impeach Jeffrey Moore and Eric Griffin, who testified against Clark at trial. Clark also asserts that the information in the 302 could have been used by him at trial to support his claim that the government witnesses were "case-jumping," and that the government's investigation was incomplete. Finally, Clark contends that the 302 report reveals a new witness, "Cole" LNU, who may have evidence favorable to his case. Because Clark

has not established that the information in the report was favorable to him and material to an issue at trial, the court will deny his motion for a new trial.

First, Clark asserts that the FBI 302 report of Jeffrey Moore's second interview could have served as impeachment evidence against Moore as it tended to expose Moore's animosity toward Clark as well as placed Moore's basis of knowledge and motive for testifying in a different light. Clark contends Moore's motive for testifying – as testified to by Moore at trial – was to change his life. Yet, Clark asserts that the 302 report reveals otherwise – namely, that Moore's true purpose in testifying was "tactical recrimination due to his unfounded belief that the Defendant's girlfriend had caused [Moore] to be arrested." (Def.'s Br. at 5).

The 302 report includes Moore's description of a conversation he had with Clark in the jail – some time after Moore began cooperating with law enforcement. According to the report, Moore stated that as he spoke to Clark, Clark asked "if it was true what the streets were saying" – that Moore disclosed to police where the gun, mask, and car used in one of the bank robberies could be found. Moore told Clark that it was Clark's "girl Champagne who was the reason they were in custody." Clark then responded that Moore could not be upset with him. However, Moore told Clark that he would take the stand against him, to which Clark stated "he was homeless and that Moore should spare him if he could." Moore then told Clark "it was wrong for him to have talked to a woman about what happened." Clark also told Moore "that he did a total of nine robberies with Money [Eric Griffin], and that he wants immunity before he talks about them." (Gov't.'s Resp. Br., Ex. A at 2-3) (Docket #181-1).

Initially, the court notes that much of the information contained in the 302 report appears to be inculpatory rather than exculpatory. The exchange between Moore and Clark – including Moore's statements that it was Clark's girlfriend, and not Moore, that caused them to be in custody – tends to demonstrate that Moore and Clark committed the charged offense together. Indeed, given the inculpatory nature of the 302 report, it is quite a stretch for Clark to argue that he would have offered it as evidence, with the purpose of confronting Moore about his statement that Clark's girlfriend caused them to end up in custody, simply to show that the real reason Moore was testifying was to get back at Clark. Such a litigation tactic seems needlessly self-destructive and more damaging to Clark than to Moore's credibility as a witness.

Nevertheless, even if the evidence is characterized as favorable under *Brady*, Clark cannot clear the second hurdle of the *Brady* test – materiality. There is no reasonable probability that the outcome of Clark's trial would have been different had Clark possessed this evidence prior to trial. This is not an instance where the government's case rested solely on Moore's uncorroborated testimony. Among other evidence, at trial, the government introduced the testimony of numerous other witnesses, including Eric Griffin, Robin Arnold, and William Easter. Furthermore, the government offered DNA evidence tending to show that Clark had contact with the mask and gloves used to commit the bank robbery with Moore. Accordingly, in light of the full context of the weight and credibility of all evidence presented at trial, the court finds the suppressed evidence – that Clark contends could have been used to impeach Moore – would not have affected the outcome of

the trial and does not undermine confidence in the verdict. Thus, Clark is not entitled to a new trial in this respect.

Clark also asserts that the information in the 302 report demonstrates that Moore was an informant for the government, entitling him to an informant's instruction. However, the court instructed the jury that it was required to weigh the testimony of Moore, as well as that of the other co-actor testimony, with "caution and great care" because of the benefits they each received from the government. Thus, Clark's argument is without merit as the court properly instructed the jury on the need for special caution and careful consideration in relying upon Moore's testimony.

Clark next contends that he is entitled to a new trial because the information in the withheld 302 report tends to show that Eric Griffin ("Griffin") bore a personal animosity against Clark and this personal animosity served as a motive to testify falsely against Clark. The 302 report recounts Moore's recollection of a conversation he had with Griffin in jail. The conversation took place before Griffin had been charged federally with committing five armed bank robberies with Clark. According to Moore's account, "Moore told Money [Griffin] that he was in for a case he did with Cluster [Clark]. Money told Moore that he and Cluster caught a case together back in the 1990's and that Cluster's sister told on them and that she eventually testified against both of them. Money told Moore that Cluster should just kill himself and help us all out. Money further stated that he told Cluster to stay low because everyone was hot." (Gov't.'s Resp. Br., Ex. A at 1) (Docket #181-1).

While Griffin's statement that Clark should "just kill himself" could tend to show that Griffin harbored some degree of animosity toward Clark,

when viewed in context, Griffin's statement actually appears heavily inculpatory because it tends to show that Clark and Griffin were involved in criminal activity together. By stating that Clark should "help us all out" by killing himself it would seem to indicate that Clark had inside information that would be harmful to Griffin if relayed to law enforcement or that, for whatever reason, Clark was complicating Griffin's situation with law enforcement. Moreover, Griffin's statement that he told Clark to "stay low because everyone was hot" suggests that the two communicated about law enforcement's investigation of their activities. Accordingly, it is difficult to conclude that Griffin's statements in the 302 report could be construed as favorable to Clark. However, even assuming the statements are favorable to Clark's defense in some capacity, the court finds that Clark has not established the evidence's materiality. Again, this is not an instance in which the government's case rested solely on Griffin's uncorroborated testimony. Accordingly, the court does not find that the newly discovered impeachment evidence entitles Clark to a new trial.

Clark also claims that the information in the withheld 302 report supports his theory that the prosecution witnesses were "case jumping." An individual "case jumps" when he faces prosecution for one crime, obtains information – either from other witnesses, television, or discovery materials kept at the jail – about the crimes allegedly committed by others in the jail, and relays that information to law enforcement as if the individual witnessed the conduct directly or heard the defendant admit to the conduct in the jail, all with the purpose of obtaining leniency in his own prosecution.

As to Griffin, Clark seems to be arguing that Griffin's testimony at trial, as well as the information he disclosed to law enforcement in his

January 27, 2012 debriefing, about the original target of the February 17, 2010, robbery being the Pyramax Bank in downtown Milwaukee – not the Anchor Bank in West Allis that the group ultimately robbed – was an example of case jumping. Thus, Clark posits that Griffin learned about the Pyramax Bank robbery during the November 2010 meeting with Jeffrey Moore in jail, concocted a story about Pyramax Bank being the bank the group planned to rob earlier in the day on February 17, 2010, and fed that story to police during his debriefing and at trial to bolster his usefulness. Clark further asserts that Griffin made up the fact that Moore was an individual who Clark had tried to get involved in the robbery crew around the time of the February 17, 2010 robbery.

Clark's theory in this regard is a leap. For one, the withheld 302 report does not refer to any discussion between Griffin and Moore about the Pyramax robbery. Thus, the argument lacks factual support. Furthermore, Clark's assertion that Griffin only referenced the Pyramax Bank robbery because Moore told him that he robbed it with Clark in August of 2010 seems to bolster Moore's testimony while only marginally discrediting Griffin's recollection that the Pyramax Bank was a target of his crew earlier in the year. Thus, the information appears neither favorable nor material to Clark's defense of case jumping.

Additionally, with regard to Moore, Clark suggests that the withheld 302 report shows that Moore knew the details of the Madison, Delafield, and West Allis robberies committed by Griffin and his crew. In turn, Clark posits that this evidence tends to show that Moore, and not Clark, was a member of the robbery crew. However, again, Clark stretches the favorableness and materiality of this information. The 302 report simply shows that Moore

likely learned the outline of these robberies from Griffin, not that he was involved in these robberies. And, even if Moore would have admitted on cross-examination that he learned about the robberies from Griffin, Clark has not shown how this would have contradicted the testimony of any other witness or would have indicated inside knowledge on the part of Moore. In this sense, the court concludes that the government's suppression of the 302 report does not undermine confidence in the outcome of the trial.

Next, Clark argues that the information in the 302 report would have allowed him to lay a foundation for his argument that an individual called "Bushwick" [William Easter] committed a series of robberies with Griffin, instead of Clark. However, this argument is also without merit. According to the report, Griffin told Moore that Clark knew about other bank robberies that Griffin and Bushwick did. However, this statement cannot be viewed in isolation. The report goes on to reveal that Griffin also told Moore that he had "sent *the guys* out to do three robberies," and that "he was on a bracelet" at the time, so he merely "peeped them out" beforehand. After the robberies took place "*the guys* came back to Griffin's house to split the loot up." (Gov't.'s Resp. Br., Ex. A at 1) (Docket #181-1).

Thus, the information in the 302 report does not clearly indicate that Bushwick, rather than Clark, committed a series of robberies with Griffin. Instead, the 302 report alludes to the fact that Griffin was not present at the actual robberies, but helped plan them out. Moreover, the report seems to indicate that several "guys" were included in the robbery crew – one of whom could have been Clark. Similar to his case jumping theory, Clark's argument in this respect springs to conclusions that are not reasonable based on the totality of the information contained in the 302 report. Accordingly,

the court does not find this newly discovered information to be the basis for a new trial.

Clark makes two final arguments in his motion for a new trial. First, he contends that the 302 report's reference to "Cole" constitutes information about either a potential defense witness or a further subterfuge by Moore – to conceal a pre-existing criminal association with Eric Griffin. The 302 report recounts Moore's conversation with a "Cole" in the jail. The report notes that "Cole was talking about being in the fed joint. Cole pointed over to cell 44 and asked Moore if he knew who Cluster was. Moore told Cole that he knew who Cluster was and he had caught a case because of Cluster. Cole then told Moore that the guy in cell 44 was named Money and that he was Cluster's 'rappy' from an earlier case." (Gov't.'s Resp. Br., Ex. A at 1) (Docket #181-1). Clark contends that Cole does not exist. And, he argues that had he been allowed to cross-examine Moore about Cole, he could have shown that Moore made him up, thus discrediting Moore's other testimony regarding his lack of involvement in the robberies that Clark contends he took part in, rather than Clark himself. This argument is entirely speculative. Moreover, even assuming Clark's cross-examination of Moore on this point would tend to show that Cole did not exist, there is no reason to assume that this would have changed the outcome of the trial or that it undermines confidence in the verdict.

Finally, Clark suggests that Moore's knowledge of the other robberies committed by the Griffin crew, as suggested by the 302 report, should have caused law enforcement to further their investigation of Moore – specifically, law enforcement should have tested the gun, pillow case, towel, gloves, and automobile for Moore's DNA and fingerprints. Yet, Moore admitted to

handling this evidence. Thus, it is unclear how additional DNA testing would have furthered the government's investigation as to Moore. Moreover, the evidence introduced at trial all tends to show that Clark committed the earlier robberies with Robin Arnold, Eric Griffin, and William Easter. All three co-actors testified that Clark committed these robberies with them. Phone records demonstrated calls between the members of this crew the morning of one of the robberies. Business records also show that Clark paid for a Mercedes and repairs for the Mercedes with thousands of dollars in cash in the hours after three of the robberies. Thus, it becomes clear that even assuming the 302 report could be read to suggest that Moore, rather than Clark, committed the earlier robberies with Griffin, Arnold, and Easter, there is ample contradictory evidence in the record, such that the outcome at trial would not have been different. Accordingly, for all of the reasons stated above, the court will deny the defendant's motion for a new trial.

Therefore,

**IT IS ORDERED** that defendant's motion for a new trial (Docket #180) be and the same is hereby **DENIED**.

**DATED: June 4, 2012**

                                        s/ J. Phil Gilbert
                                        **J. PHIL GILBERT**
                                        **DISTRICT JUDGE**